UNITED STATES

v.

**Technical Sergeant Jason J. HOBBS,
United States Air Force.**

Misc. Dkt. 2005–04.

U.S. Air Force Court of Criminal Appeals.

26 Oct. 2005.

Appellate Counsel for the United States: Lieutenant Colonel Gary F. Spencer, Lieutenant Colonel Robert V. Combs, Major Michelle M. McCluer, and Major Jin–Hwa L. Frazier.

Appellate Counsel for Appellee: Colonel Carlos L. McDade, Lieutenant Colonel Mark R. Strickland and Captain Anthony D. Ortiz.

Before STONE, SMITH, and MATHEWS, Appellate Military Judges.

## OPINION OF THE COURT

MATHEWS, Judge:

The military judge in this case granted a motion to suppress evidence indicating a urine sample taken from the accused, Technical Sergeant (TSgt) Jason J. Hobbs, tested positive for the presence of benzoylecgonine, a metabolite of cocaine. The government appeals that decision pursuant to Article 62, UCMJ, 10 U.S.C. § 862. On careful consideration of that appeal, the record to this point in the proceedings, and the excellent appellate briefs prepared by both sides, we conclude that the military judge erred in suppressing TSgt Hobbs' urinalysis results. We therefore set aside that decision and remand the case to the trial court for further proceedings.

*Background*

The facts surrounding the contested urinalysis were well-developed in the court below. On the evening of 19 February 2005, Staff Sergeant (SSgt) Thomas Tedesco hosted a party at his home near Davis–Monthan Air Force Base (AFB), Arizona. Among the

persons attending were TSgt Hobbs and his wife. Alcoholic beverages were present at the party, and at one point TSgt Hobbs left to get more liquor. He returned 45 minutes to an hour later with more alcohol. On TSgt Hobbs' return, SSgt Tedesco noticed that his behavior had changed: TSgt Hobbs appeared to be "hyper and jittery" and acted like a "totally different person."

During the course of the party, both TSgt Hobbs and SSgt Tedesco drank alcohol, apparently heavily. At some point in the evening, the two engaged in a conversation. According to SSgt Tedesco, TSgt Hobbs said that he had some "good stuff" that would "get you going." According to SSgt Tedesco, TSgt Hobbs went on to explain that the "good stuff" was cocaine, and later admitted to using cocaine "recreationally" for about four years. SSgt Tedesco said that a short while later, he had a conversation with TSgt Hobbs' wife, who confirmed that TSgt Hobbs used cocaine on occasion, but said she believed the last time he used the drug was in January.

On 23 February 2005, SSgt Tedesco visited the Air Force Office of Special Investigations (AFOSI) and filled out a sworn statement concerning the events at the party four days before.[1] After speaking with SSgt Tedesco, Investigator (Inv) Marquis Navarro, AFOSI, contacted Captain (Capt) Timothy Rushenberg, a judge advocate at the base legal office, to inform him of SSgt Tedesco's allegations. Both Inv Navarro and Capt Rushenberg concluded that there was enough information to request a search authorization. They called Colonel (Col) Cesar Rodriguez Jr., who was then serving as the Mission Support Group Commander and as a military magistrate. Inv Navarro informed Col Rodriguez of the allegations, and also provided additional background information on drug use and detection.[2]

---

1. The party was held on a Saturday, the first day of a three-day weekend. SSgt Tedesco initially contacted AFOSI on the first duty day after the party, 22 February 2005, and was interviewed first thing in the morning the following day.

2. The military judge concluded that Col Rodriguez was given, inter alia, all of the information contained in an affidavit later prepared by Inv Navarro in support of the search authority. A copy of the affidavit is attached to this decision as Appendix A.

This was not Col Rodriguez's first exposure to the world of military justice. In addition to attending the base's "cops and robbers" meetings,[3] Col Rodriguez had acted on several prior search requests. After being briefed, Col Rodriguez asked Inv Navarro whether he believed SSgt Tedesco; Inv Navarro said that he did. Capt Rushenberg advised Col Rodriguez that SSgt Tedesco's statements, together with the supporting information provided by the investigator, were legally sufficient for a finding of probable cause to seize urine and hair from TSgt Hobbs. Col Rodriguez then determined that there was probable cause and granted authority to seize both hair and urine samples from TSgt Hobbs.[4]

### Procedural History

TSgt Hobbs was arraigned before a special court-martial convened at Davis–Monthan AFB on 21 July 2005, charged with a single specification of wrongful use of cocaine, in violation of Article 112a, UCMJ, 10 U.S.C. § 912a.[5] Prior to the entry of pleas, TSgt Hobbs moved to suppress the urinalysis results, arguing that the search authority granted to seize his urine on 23 February 2005 lacked probable cause. After taking testimony from Inv Navarro and SSgt Tedesco, the military judge granted the motion.

Pursuant to Rule for Courts–Martial (R.C.M.) 908(b)(1), the trial counsel requested a 72–hour delay to decide whether to appeal the military judge's ruling. The military judge granted the delay. The next day, the trial counsel moved for reconsideration of the military judge's ruling on the motion pursuant to R.C.M. 905(f), proposing to offer additional testimony from Inv Navarro and an affidavit from Col Rodriguez.[6]

The military judge granted the motion for reconsideration, refused to accept Col Rodriguez's affidavit,[7] but did consider the testimony from Inv Navarro. The military judge then sua sponte recalled SSgt Tedesco and called a new witness: Capt Bryan Huffman, a member of the base legal office at Davis–Monthan AFB. After hearing from the three witnesses and considering additional argument from counsel, the military judge reaffirmed his prior ruling that there was no probable cause. He further found, for the first time, that Col Rodriguez was not a "neutral and detached" official—a conclusion that, if correct, would further render the search authorization invalid.

The government elected to press on with its Article 62, UCMJ, appeal, and the appeal was timely filed. The issue is now properly before us for review.

### Discussion

The United States may appeal any "order or ruling which excludes evidence that is substantial proof of a fact material in the proceeding." Article 62(a)(1)(B), UCMJ. A positive drug urinalysis result is an example of such evidence. Standing alone, a positive urinalysis may be legally sufficient to sustain a conviction for wrongful use of a controlled substance, even in the face of contrary evidence offered by the defense. *United States*

---

3. "Cops and robbers" meetings are those in which key commanders are briefed on local investigations, court cases, and other military justice matters.

4. The record suggests that the hair sample was too small to allow testing; it was, in any event, not part of the defense motion to suppress.

5. A second specification of attempted wrongful distribution of cocaine, in violation of Article 80, UCMJ, 10 U.S.C. § 880, was dismissed prior to arraignment at the direction of the convening authority.

6. The trial counsel made an offer of proof that Col Rodriguez was TDY for a military exercise at the time of trial, a fact not contested by the trial defense counsel and apparently accepted by the military judge.

7. The military judge explained his rejection of the affidavit as follows: "I think there has to be some consequence for a party ... when they don't completely prepare to meet an issue—and this is one of those sorts of consequences that can be imposed by a military judge." The military judge cited no authority for his belief that there "has to be some consequence," and the record discloses no bad faith or other basis for sanctioning the trial counsel in this manner. We find that the military judge abused his discretion by excluding the affidavit based on personal feelings about the need for "some consequence" and will consider the affidavit; however, even were the affidavit excluded, it would not change the resolution of this appeal.

*v. Ford*, 23 M.J. 331, 332 (C.M.A.1987). The military judge's order excluding TSgt Hobbs' positive urinalysis therefore meets the jurisdictional requirements of Article 62, UCMJ.

In ruling on appeals under Article 62, UCMJ, we "may act only with respect to matters of law." Article 62(b), UCMJ. We are bound by the factual determinations of the military judge, except where they are unsupported by the record or are clearly erroneous. *United States v. Burris*, 21 M.J. 140, 144 (C.M.A.1985); *United States v. Plants*, 57 M.J. 664, 665 (A.F.Ct.Crim.App. 2002). We consider the military judge's conclusions of law de novo. *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F.1995). "On questions of fact, [we ask] whether the decision is *reasonable;* on questions of law, [we ask] whether the decision is *correct.*" *United States v. Baldwin*, 54 M.J. 551, 553 (A.F.Ct.Crim.App.2000) (quoting 2 Steven A. Childress & Martha S. Davis, *Federal Standards of Review* § 7.05 (3d ed.1999)). If the answer to either question is "no," then the military judge abused his discretion. *Ayala*, 43 M.J. at 298.

As noted before, the military judge suppressed the urinalysis results on two grounds: first, finding that there was no probable cause to search and seize TSgt Hobbs' urine; and second, that the magistrate, Col Rodriguez, was not neutral and detached. We will address the second issue first.

### Status as a "Neutral and Detached" Magistrate

An authorization to search and seize evidence may be issued upon a finding of probable cause by a commander or an authorized magistrate. Mil. R. Evid. 315. To be valid, however, the probable cause determination must be made by an official who is "neutral and detached." *United States v. Rivera*, 10 M.J. 55, 58 (C.M.A.1980). The term "neutral and detached" has been treated as synonymous with "impartial." *United States v. Staggs*, 48 C.M.R. 672, 674–75, 1974 WL 13888 (C.M.A.1974).

■ A commander or magistrate who takes an active and personal part in the gathering of evidence, or otherwise acts "as a law enforcement official," is not neutral and detached and cannot authorize a valid search. *United States v. Freeman*, 42 M.J. 239, 243 (C.A.A.F.1995). Thus, engaging in "police activity," such as setting up a sting operation, authorizing the use of informants, authorizing controlled buys of drugs, personally conducting the search, or personally seizing the contraband, is not permitted. *United States v. Murray*, 12 M.J. 139, 141 (C.M.A.1981); *United States v. Cordero*, 11 M.J. 210, 214 (C.M.A.1981); *Rivera*, 10 M.J. at 57; *Ezell*, 6 M.J. at 319.

■ Nothing in the record suggests that Col Rodriguez took such a role in this case; his only involvement was in determining probable cause and authorizing the seizure of TSgt Hobbs' urine and hair. Nor is there any evidence that Col Rodriguez was active in law enforcement generally. Although trial defense counsel challenged Col Rodriguez's attendance at Davis–Monthan's informational "cops and robbers" meetings, we agree with the military judge's conclusion that his attendance was not per se disqualifying. A commander may, incident to his responsibility to maintain good order and discipline, take such steps as are necessary to inform himself about his troops and the disciplinary environment in which they function, without losing his right to authorize searches which can produce admissible evidence. *Freeman*, 42 M.J. at 243.

■ The military judge nonetheless concluded that Col Rodriguez was not neutral and detached. His exceptionally brief findings of fact, however, disclose that the military judge's focus was not on this case, but rather on Col Rodriguez's actions in a handful of prior cases:

> [Because] he *has always asked* Investigator Navarro, "Do you believe him?"—as to the informant—*and then* gone ahead *and granted* search authority, and that there is no evidence that Colonel Rodriguez *has denied* a search request *or asked* any meaningful, probing, clarifying questions of Investigator Navarro, the court finds that Colonel Rodriguez was not neutral and

detached when he issued the search authorization *in this case.*

(Emphasis added.)

In entering a finding of fact, the military judge must rely on evidence of record that fairly supports that finding; and in the absence of such evidence, the military judge's finding is error as a matter of law. *United States v. Bradford,* 25 M.J. 181, 184 (C.M.A. 1987). Yet the record reveals nothing about the facts of the prior cases. There is nothing to suggest that Col Rodriguez's determinations were incorrect, let alone that they betrayed any signs of bias. In short, nothing about *those* cases in any way suggest that the magistrate was not neutral and detached in *this* case—a point recognized by the military judge himself in the following colloquy with the defense counsel:

> DC: So, given that information, it appeared—either that the search authority was not neutral and detached—now, given—also—that he attends cops and robbers meetings regularly every Tuesday—now, also given—when he is in town—now, also given the fact that he has done somewhere in the neighborhood of four to seven other search authorizations and has granted every one of them—
>
> MJ: *But, that doesn't mean that there—*
>
> DC: —no—
>
> MJ: *—that there wasn't solidly probable cause in each one of those cases.*

(Emphasis added.)

As the military judge surmised, the fact that a magistrate grants a small number of search authorities while denying none does not, in itself, establish a lack of neutrality or detachment in a subsequent case. Standing alone, and without context, this sparse history has no probative value whatsoever. It is unreasonable and clearly erroneous to conclude a magistrate lacks neutrality or detachment on the strength of such anecdotal data. Though the military judge did not base his

ruling on the magistrate's conduct in *this* case, we have considered it closely and see no sign of bias. Accordingly, we find the military judge erred.

### Probable Cause Determination

Probable cause exists when there is a reasonable belief that the person, property, or evidence sought is located in the place to be searched. Mil. R. Evid. 315(f)(2). Probable cause "merely requires that a person 'of reasonable caution' could believe that the search may reveal evidence of a crime; 'it does not demand any showing that such a belief be correct or more likely true than false.'" *United States v. Bethea,* 61 M.J. 184, 187 (C.A.A.F.2005) (alterations in original) (quoting *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)). "[C]lose calls will be resolved in favor of sustaining the magistrate's decision." *United States v. Monroe,* 52 M.J. 326, 331 (C.A.A.F.2000) (quoting *United States v. Maxwell,* 45 M.J. 406, 423 (C.A.A.F.1996)).

■ A magistrate must evaluate information presented for a probable cause determination in a "practical, common-sense" manner, considering the information itself, as well as the reliability and basis of knowledge of the source of the information. *United States v. Carter,* 54 M.J. 414, 418 (C.A.A.F. 2001) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Where the source is an identified member of the armed forces, the "degree of accountability" to which the member is subject may be sufficient to overcome a lack of proven reliability because military members are "in a poor position to fabricate with impunity." *United States v. Tipton,* 16 M.J. 283, 287 (C.M.A.1983). *See also United States v. Sloan,* 30 M.J. 741, 745 (A.F.C.M.R.1990) (information from citizen-witnesses is presumed reliable).[8]

■ When a magistrate has determined that probable cause exists, that decision is

---

8. While trial defense counsel complained at one point that Col Rodriguez should not have asked Inv Navarro whether he believed SSgt Tedesco, we do not believe such questions are improper or necessarily indicative of bias; in fact, under the circumstances of this case, they demonstrate just the opposite. Col Rodriguez knew SSgt Tedesco professionally, and had no basis for questioning his credibility. Just as there is nothing wrong with a commander relying on his or her own assessment of the witness's credibility, we see nothing wrong with reaching out to obtain the assessment of others. *See United States v. Rushing,* 11 M.J. 95, 97 (C.M.A.1981).

entitled to considerable respect and should not be disturbed lightly. *See, e.g., United States v. Mason,* 59 M.J. 416, 421 (C.A.A.F. 2004) (magistrate's decision is entitled to "substantial deference"); *United States v. Cravens,* 56 M.J. 370, 375 n. 2 (C.A.A.F.2002) ("systems of justice grant deference" to magistrates); *Carter,* 54 M.J. at 419 ("great deference"); *United States v. Rhea,* 29 M.J. 991, 998 (A.F.C.M.R.1990) ("presumption of validity"). In reviewing a magistrate's probable cause determination, a military judge does not conduct a de novo review, but need merely "ensure that the magistrate had a 'substantial basis for ... conclude[ing]' that probable cause existed." *Carter,* 54 M.J. at 418 (citing *Gates,* 462 U.S. at 238–39, 103 S.Ct. 2317); *see also Massachusetts v. Upton,* 466 U.S. 727, 728, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984).

■ Applying these standards to the information presented to the magistrate, it is abundantly clear that there was a substantial basis for concluding that probable cause existed. Col Rodriguez knew that SSgt Tedesco—a noncommissioned officer who would be subject to substantial penalties for false reporting—had just provided a voluntary statement to AFOSI implicating TSgt Hobbs in the use of cocaine.[9] Specifically, SSgt Tedesco claimed that TSgt Hobbs had attended a party at SSgt Tedesco's home four days before; that, in the space of a relatively short absence from the party, TSgt Hobbs had undergone a transformation that left him "acting like a totally different person"; that TSgt Hobbs was, on his return, "hyper and jittery"; that he remained hyper despite his heavy consumption of high-proof alcohol; that TSgt Hobbs said he had "good stuff" that would "get you going"; that TSgt Hobbs identified the so-called good stuff as cocaine; that TSgt Hobbs admitted he had been using cocaine "recreationally" for several years; and that the party was within a window of time in which evidence of cocaine use could still be detected via urinalysis.

The military judge did not put on the record what degree of deference he used in evaluating Col Rodriguez's decision, or even that he afforded it any deference at all. We find that when evaluating the probable cause determination in light of the deference it is due under the law, there was more than enough information for Col Rodriguez—or indeed any other person of reasonable caution—to conclude evidence of drug use might be found in TSgt Hobbs' urine. *See Bethea,* 61 M.J. at 187; *Mason,* 59 M.J. at 421. Thus, the military judge erred here, as well. *See Bradford,* 25 M.J. at 184.

The military judge stated, when announcing his ruling, that the validity of Col Rodriguez's probable cause determination was "a surprisingly close call." The record, in fact, solidly favors the magistrate's decision. Even were we to conclude the military judge's assessment—that the issue was a close call—was supported by the record, we would still hold that he erred. When the probable cause determination is a "close call," the issue is resolved in favor of sustaining the magistrate's decision. *Monroe,* 52 M.J. at 331.

*Application of the "Good Faith Exception"*

Having found that Col Rodriguez was a neutral and detached magistrate and that the information presented to him was sufficient to support his probable cause determination, the last portion of the military judge's ruling, in which he found that the search could not be upheld by application of the "good faith exception" of Mil. R. Evid. 311(b)(3) and *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), is essentially rendered moot. However, were we required to reach that issue, we would again hold that the military judge erred. There was nothing objectively unreasonable in the conduct of Inv Navarro. As noted above, Col Rodriguez was "neutral and detached" in the performance of his duties as magistrate, and the facts were not—as the military judge himself recognized when calling the question "close"—so blatantly lacking as to make reli-

---

9. The military judge commented that he was "greatly skeptical" whether the voluntary nature of SSgt Tedesco's statement "has a bearing on [his] truthfulness." Our courts have long held that voluntariness is a factor to be considered favoring reliability. *United States v. Wood,* 25 M.J. 46, 48 (C.M.A.1987). *See also United States v. Land,* 10 M.J. 103, 106 (C.M.A.1980) (Fletcher, J., concurring) (compelled statement less reliable than voluntary one).

ance on the warrant unreasonable. We note that Col Rodriguez acted on the advice of a judge advocate; that he had received training on the laws applicable to his position as magistrate; that the application was made under oath; and that the search authorization was reduced to writing; all of which support application of the "good faith exception." *See United States v. Lopez*, 35 M.J. 35, 40 (C.M.A.1992).

*Conclusion*

The appeal by the United States pursuant to Article 62, UCMJ, is granted. The decision of the military judge to suppress the results of TSgt Hobbs' urinalysis is set aside. The case is remanded to the trial court for further proceedings.

## APPENDIX A

### AFFIDAVIT SUPPORTING REQUEST FOR AUTHORITY FOR SEARCH AND SEIZURE

1. I, MARQUIS NAVARRO, an Investigator with the United States Air Force Office of Special Investigations (AFOSI) and a member of the Air Force assigned to Davis Monthan AFB (DMAFB), Arizona (AZ), having been duly sworn, depose and state that on 23 Feb 05, AFOSI Detachment 217 conducted a witness interview of STAFF SERGEANT THOMAS ANTHONY TEDESCO, 355th Communications Squadron, DMAFB, AZ.

2. I am conducting an investigation involving the use, possession, and distribution of controlled substances, a violation of Article 112A, UCMJ. The SUBJECT in this investigation is identified as TECHNICAL SERGEANT JASON JOHN HOBBS, Male Born: 29 May 72, PA, TSgt, [redacted], 612th Air Communications Squadron (ACC), Davis–Monthan AFB, AZ.

3. This affidavit is prepared in support of a Search Authorization, which will permit the AFOSI, specifically myself, any detailed medical personnel, and/or any other agent or agents necessary, to search and seize head and/or body hair for the purpose of drug testing from HOBBS' body.

4. On 23 Feb 05, TEDESCO provided AFOSI the following information: On 19 Feb 05, TEDESCO threw a party at his residence (5617 Monrovia Ave, Tucson, AZ 85706) and invited several individuals from his duty section. Additionally, he also invited TECHNICAL SERGEANT JASON JOHN HOBBS, [redacted], 612 ACOMS/HVAC and HOBBS' wife, MARY HOBBS (M. HOBBS). At the beginning of the party, HOBBS was sober and acting "normal." Sometime during the party, HOBBS decided to leave to "get more liquor" and said he would be back shortly. HOBBS was gone for over an hour and, when he returned, he was acting like a "totally different person." TEDESCO described HOBBS behavior as "hyper and jittery." TEDESCO also noticed HOBBS was drinking heavily and, despite the amount of alcohol he consumed, remained hyper and jittery. TEDESCO witnessed HOBBS drinking Everclear straight from the bottle and he was taking "big gulps" rather than sips. A little later in the evening, everyone moved from the backyard into the house, with the exception of TEDESCO and HOBBS. After the two made "small talk" for a while, HOBBS told TEDESCO he had some "good stuff" that would "get you going." TEDESCO was unclear of what HOBBS was talking about. TEDESCO asked HOBBS what he meant by "good stuff" and HOBBS reply "I'm talking about coke…cocaine." HOBBS further explained that the cocaine was not very potent and would only stay in his system for 1–2 days. At that point, TEDESCO felt uncomfortable and went back inside. A little later, TEDESCO asked HOBBS to come and talk with him in the front yard. There, TEDESCO explained he couldn't believe HOBBS was talking about using cocaine, especially given the fact HOBBS was a Tech Sergeant. HOBBS said it was "no big deal" and that he had been using cocaine "recreationally" for the past four years. The entire matter made TEDESCO upset and, as a result, he told everyone at the party to leave. TEDESCO then explained the situation to his wife. While he was talking to his wife, M. HOBBS approached TEDESCO and asked if he called off the party due to something HOBBS had said. TEDESCO told M. HOBBS "your husband just offered me

coke." M. HOBBS replied "that's impossible, he only does it once in a while, and the last time we used was on my birthday on New Years."

5. I, INV MARQUIS NAVARRO, have been assigned to AFOSI Det 217 Joint Drug Enforcement Team since 15 Apr 04. In that time I have conducted over 30 subject/witness interviews, performed over 18 person/place searches and have processed countless items as evidence. I am a member of the Arizona Narcotics Officers Association and have attended the following courses: Drug Test Kit Certification, Drug Identification, Street Development (identifying narcotics and various transactions) and Physical & Electronic Surveillance. I have also attended the JOHN REID and ASSOCIATES Principals of Interviewing and Interrogations regular and advanced courses. Before my time here at AFOSI Det 217, I was assigned to the 355th Security Forces Squadron as a Desk Sergeant. In total, I have been in the Law Enforcement career field for over eight years and have been involved in cases ranging from security violations to domestic violence.

6. Based upon my experience and training. I found TEDESCO to be believable. He voluntarily approached AFOSI to provide the information about HOBBS, and appeared to be sincere and trustworthy. There is a factual basis to this request for a search authorization because STAFF SERGEANT TEDESCO personally spoke to HOBBS, and was a first-hand witness to the hyper and jittery behavior by HOBBS' prior to HOBBS' offer to TEDESCO to try cocaine. Only four (4) days has elapsed from the suspected cocaine use by HOBBS and the requested search and seizure of HOBBS' urine and hair. Based upon my experience, cocaine stays in a person's system from 3 to 7 days, depending on the quantity and purity of the cocaine. Thus, a seizure of his urine would detect such wrongful use of cocaine on 19 February 2005. Additionally, the circumstances and facts indicated that a search and seizure of a sample of HOBBS' hair is reasonable and justifiable. Based upon my training. I am aware that hair testing takes advantage of the fact that drugs and their metabolites are incorporated into the hair of those who ingest drugs. Once incorporated, these drugs and metabolites remain in the hair largely unchanged, for as long as the hair remains on the body. Therefore, it is possible to use hair drug testing to "look back in time" to determine the drug use history of an individual. The history is essentially limited only by the length of hair available at the time the investigation ensues. If an individual ingests a drug only one time, the small amount incorporated is not easily detected. However, as the number of uses increases, the total amount of drug and metabolite incorporated into a person's hair increases. Positive hair drug testing results indicate that the person chronically or repetitively used drugs during the time period represented by the hair being tested. Based upon the aforementioned, it is reasonable to believe that cocaine could be found in HOBBS' system.

7. On 23 Feb 05, I briefed CAPT TIMOTHY RUSHENBERG, 355th Wing Staff Judge Advocate, on this investigation. RUSHENBERG believed, based on the information provided, the military magistrate could conclude a violation of Article 112a, UCMJ, use, possession, and distribution of controlled substances, occurred and that HOBBS likely committed the offense. RUSHENBERG advised the military magistrate that he could conclude that probable cause existed to conduct a search of HOBBS' body to obtain hair and urine samples for drug testing.

8. In view of the foregoing, I respectfully request search authorization to conduct a search and seizure of HOBBS' body to obtain hair and urine samples for drug testing. AFOSI is requesting to search a sample of HOBBS' urine and hair to determine the nature of HOBBS' drug use on 19 February 2005 and on past occasions.